**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

AMERICAN FEDERATION OF          :
GOVERNMENT EMPLOYEES - LOCAL    :
1904, et al.,                   :
                                : CIVIL ACTION NO. 07-4548 (MLC)
        Plaintiffs,             :
                                :    **MEMORANDUM OPINION**
        v.                      :
                                :
ROBERT M. GATES, et al.,        :
                                :
        Defendants.             :
_____:

**COOPER, District Judge**

Plaintiffs, American Federation of Government Employees -
Local 1904, a union representing more than 5,000 Fort Monmouth
employees ("Union"), the Union president, and certain Union
members (collectively, the "Plaintiffs"), commenced this action
against (1) Robert M. Gates, in his official capacity as
Secretary of Defense ("Secretary"), (2) Peter Geren, in his
official capacity as Secretary of the Army, (3) David M. Walker,
in his official capacity as the Comptroller General, (4) Claude
M. Kicklighter, in his official capacity as the Inspector General
of the Department of Defense, and (5) the 2005 Base Realignment
and Closure Commission ("BRAC Commission", and collectively with
the other defendants, the "Defendants").  (Compl., at ¶¶ 4-11.)
Plaintiffs allege, <u>inter alia</u>, that "[t]he actions of the
Secretary of Defense and the Secretary of the Army in proceeding
with any activity associated with a closure of Fort Monmouth

before providing the required 'detailed report' to Congress . . .
is illegal as contrary to federal law and/or is ultra vires
and/or is arbitrary, capricious, and unreasonable."  (<u>Id.</u> at ¶
115.)  On the same date Plaintiffs filed the complaint, they also
submitted a proposed Order to Show Cause requesting that the
Court (1) temporarily restrain and prohibit the Defendants from
taking any further action with respect to the closure of Fort
Monmouth, and "issuing or accepting or entering into any
contracts with third parties generally, and/or from taking any
further action whatsoever under [the Request for Proposals] until
further Order of the Court", and (2) grant them certain
additional preliminary injunctive relief.  (Dkt. entry no. 2,
Pls. Prelim. Injunc. Br., at 1-4).[1]

---

[1] To avoid confusion, the parties' briefs will be referenced
as follows: (1) Plaintiffs' brief in support of their application
for a temporary restraining order, a preliminary injunction, and
expedited discovery will be cited as "Pls. Prelim. Injunc. Br.,
at __" (<u>see</u> dkt. entry no. 2); (2) Defendants' opposition to
Plaintiffs' request for a temporary restraining order will be
cites as "Defs. TRO Br., at __" (<u>see</u> dkt. entry no. 5); (3)
Defendants' brief in support of their motion to dismiss will be
cited as "Defs. Motion to Dismiss Br., at __" (<u>see</u> dkt. entry no.
8-2); (4) Defendants' brief in opposition to Plaintiffs' request
for a preliminary injunction will be cited as "Defs. Prelim.
Injunc. Br., at __" (<u>see</u> dkt. entry no. 9); (5) Plaintiffs'
opposition to the motion to dismiss will be cited as "Pls. Motion
to Dismiss Br., at __" (<u>see</u> dkt. entry no. 11); (6) Defendants'
reply brief filed in further support of their motion to dismiss
will be cited as "Defs. Reply Br., at __" (<u>see</u> dkt. entry no.
13); (7) Plaintiffs' reply brief filed in further support of the
Order to Show Cause will be cited as "Pls. Reply Br., at __" (<u>see</u>
dkt. entry no. 14); and (8) Plaintiffs' brief in support of its
motion to supplement their prior request for injunctive relief
will be cited as "Pls. Suppl. Injunc. Br., at __" (<u>see</u> dkt. entry
no. 10-2).

This Court, on September 25, 2007, denied Plaintiffs'
application for temporary restraints, but ordered Defendants to
show cause why an order for a preliminary injunction should not
be entered.  (Dkt. entry no. 3, 9-25-07 Ord. to Show Cause.)
Thereafter, Defendants moved to dismiss the complaint for lack of
jurisdiction pursuant to Federal Rule of Civil Procedure ("Rule")
12(b)(1).  (Dkt. entry no. 8.)  Plaintiffs oppose that motion.
(Dkt. entry no. 11.)  The Court has considered the papers
submitted by the parties, and heard oral argument on October 25,
2007.  Accordingly, the Court hereby issues its findings of fact
and conclusions of law in connection with Plaintiffs' application
for a preliminary injunction, as is required by Rule 52.  For the
reasons stated herein, the Court will (1) deny Plaintiffs'
application for a preliminary injunction, and (2) deny
Defendants' motion without prejudice and with leave to move to
renew after January 1, 2008.

## BACKGROUND AND FACTUAL FINDINGS

### I.   Overview of the Base Closure and Realignment Act

The Defense Base Closure and Realignment Act, 10 U.S.C. §
2687, et seq. ("BRAC Act")[2], was enacted to create a process for

---

[2] The BRAC Act provisions referenced in this section are
located at (1) Pub.L.No. 100-510, 104 Stat. 1485, 1808-19 (1990)
(portions codified at 10 U.S.C. § 2687 note (1998)), and (2)
Pub.L.No. 107-107, 115 Stat. 1012, 1342-51 (2001) (codified at 10
U.S.C. § 2687 note (Supp. 2006)).  To avoid confusion, the
provisions will be cited as "BRAC Act § __".

the timely closure and realignment of United States military installations.  Gregoire v. Rumsfeld, 463 F.Supp.2d 1209, 1215 (W.D. Wash. 2006); BRAC Act § 2901 (explaining that the purpose of the BRAC Act is "to provide a fair process that will result in the timely closure and realignment of military installations inside the United States").  First, the Secretary prepares "[a] force-structure plan for the Armed Forces based on an assessment by the Secretary of the probable threats to the national security during the 20-year period beginning with fiscal year 2005."  BRAC Act § 2912(a)(1)(A).  The Secretary then reports on the infrastructure necessary to implement the plan.  Id. at § 2912(a)(2).  Based on this report, the Secretary certifies whether the need exists to close or realign military bases.  Id. at § 2912(b)(1).  The base-closure process terminates if the Secretary fails to provide such a certification.  Id. at § 2912(b)(2).  If the Secretary certifies that a base must be closed or realigned, the President must nominate at least eight people to serve on the BRAC Commission.  Id. at § 2902.  If the President fails to do so, the closure process terminates.  Id. at § 2902(c)(1)(C).

After the Secretary issues the required certification and the President appoints the BRAC Commission members, the Secretary must recommend the bases to be closed and realigned.  Id. at § 2914(a).  Thereafter, the Commission holds public hearings on

4

those recommendations.  Id. at § 2903(d).  Under the current version of the BRAC Act, the BRAC Commission was required to transmit a report "containing its findings and conclusions, based on a review and analysis of the Secretary's recommendations" to the President by September 8, 2005.  Id. at § 2914(d)(1).

The President must review the Secretary's recommendations and the BRAC Commission's report and prepare a further report either approving or disapproving the BRAC Commission's recommendations.  Id. at § 2914(e).  If the President disapproves the recommendations, the BRAC Commission has an opportunity to revise the report and its list of recommendations and resubmit it to the President.  Id. at § 2903(e)(3).  If the President does not transmit the revised report to Congress, the process is terminated for that year.  If, however, the President approves either the original report or the revised report, the report is then forwarded to Congress for approval.  Id. at § 2903(e)(4)-(5).  If Congress does not reject or disapprove the report within 45 days of receiving it, or by the adjournment of the Congressional session during which the report was transmitted, the Secretary must close and realign the military bases as provided in the Commission report approved by the President.  Id. at § 2904(b).  Both the President and Congress have no authority to pick and choose parts of the report to approve and disapprove. The report must be approved or disapproved as a single package.

## II.  Events Preceding Commencement of this Action

The Secretary initiated the BRAC process on November 15, 2002 by issuing a memorandum entitled <u>Transformation Through Base Realignment and Closure</u>, which "emphasized eliminating excess capacity and transforming [the Department of Defense] by rationalizing infrastructure."  (Defs. Motion to Dismiss Br., Ex. A, Excerpts from BRAC Commission Report to President ("Report Excerpts"), at 319.)  On March 15, 2005, the President nominated nine people to serve on the BRAC Commission, and the Senate later confirmed all nine nominees as "Recess Appointment".  (Compl., at ¶ 54.)  Thereafter, the Secretary established the Infrastructure Executive Council ("IEC") to oversee and operate the 2005 BRAC process, set forth policies, and provide oversight.  (Report Excerpts, at 319.)

The IEC ultimately presented a package of recommendations to then Secretary Donald Rumsfeld for final review and approval.  (<u>Id.</u>)  On May 13, 2005, Secretary Rumsfeld submitted volume 1 of the Department of Defense's recommendations for military base closures and realignments to the BRAC Commission, the public, and Congress.  (<u>Id.</u>)  The recommendations were based on numerous assessments and facility value analyses performed separately by the Army, Navy, and Air Force.  (<u>See</u> <u>id.</u> at 319-20.)  The Secretary recommended Fort Monmouth as one of the bases for closure.  (<u>Id.</u> at 10; Compl., at ¶ 57.)  The Secretary believed

6

that closing Fort Monmouth would allow the Army to pursue certain "transformational" and BRAC objectives, including "consolidating training to enhance coordination, doctrine development, training effectiveness, and improve[d] operational and functional efficiencies". (Report Excerpts, at 10.) Further, the Secretary noted that the closure would enable the consolidation of common business functions with other agencies, and thus, provide a better level of service to military personnel at a reduced cost. (Id.)

The Comptroller General, through the General Accountability Office ("GAO"), issued a report entitled, "Military Bases Analysis of the DOD's 2005 Selection Process and Recommendations for Base Closure and Realignment (July 2005)". (Compl., at ¶ 66.) According to Plaintiffs, (1) the 273-page GAO report mentions Fort Monmouth "only a total of 6 times, and never in terms that [are] specific as to any independent review as to the validity, reasonableness, accuracy or desirability of the [Department of Defense's] recommendation for closure", (2) GAO investigators visited a sampling of military bases, but did not visit Fort Monmouth, and (3) the GAO report "provided something much less then that required or contemplated by the 2005 BRAC Act, that being merely a cursory review that relied heavily upon an assumption . . . ." (Id. at ¶¶ 66-67.) Nevertheless, the BRAC Commission performed its own independent review of the

Secretary's base closure recommendations. (Id. at ¶ 69.)  In connection with its review, the BRAC Commission sent a list of 22 questions to the Department of Defense pertaining to the proposed closure of Fort Monmouth and relocation of certain of the base's organizations and functions.  (Id. at ¶ 70-71; id., Ex. B, 6-6-05 Email Re: Request for Comment on Included Questions about Closure, Fort Monmouth.)  Fort Monmouth officers and officials drafted a response answering 18 of the 22 questions, and noting that the final 4 questions would best be answered by the Army ("Fort Monmouth Response").  (Id. at ¶ 72; id., Ex. C., 7-8-05 Fort Monmouth Resp.)  However, after receiving the Fort Monmouth Response, the Department of Defense opted to draft its own written response, which included answers to the final 4 questions, and forwarded such response to the BRAC Commission. (Id. at ¶¶ 77, 79; id., Ex. D, 7-12-05 Dep't of Def. Resp.)[3]

The BRAC Commission, on September 8, 2005, presented its final report on the Secretary's recommendations to the President. (Defs. Motion to Dismiss Br., Ex. A, 9-8-05 BRAC Commission Letter to President.)  The BRAC Commission explained:

> In 2005, the Secretary made more recommendations, with more complexity, than all four previous base closure rounds combined.  We held ourselves to a high standard

---

[3] Plaintiffs note, "[i]t is not known whether [the] Fort Monmouth Report ('DCN-11913') was ever sent to the BRAC Commission, to GAO, or the President or the Congress, and if it was, whether it was sent before any formal decision had been made."  (Id. at ¶ 79.)

> of openness and transparency in all our activities and
> deliberations as we assessed these recommendations. . .
> . [T]he Commission conducted 182 site visits, held 20
> legislative and deliberative hearings, hosted 20
> regional hearings, and received well over 200,000
> written and electronic communications from the public.
> We publicly sought, and received, expert analysis and
> commentary from a variety of governmental and non-
> governmental sources to assist our independent
> analysis.

(Id. at 1.)  Against this backdrop, the BRAC Commission

recommended, inter alia, closure of Fort Monmouth.  (Report

Excerpts, at 12.)  In doing so, the BRAC Commission adopted the

Secretary's entire recommendation with respect to Fort Monmouth.

(Compare id. at 10 (Secretary Recommendation) with id. at 12

(Commission Recommendation).)  However, the BRAC Commission

stated that the Secretary "shall submit a report to the

Congressional Committees of Jurisdiction" explaining that moving

the organizations and activities located at Fort Monmouth to the

Aberdeen Proving Ground will not disrupt support for the "Global

War on Terrorism or other critical contingency operations and

that safeguards exist to ensure that necessary redundant

capabilities are put in place to mitigate potential degradation

of such support, and to ensure maximum retention of critical

workforce."  (Id. at 12.)  The BRAC Commission added this

reporting requirement to allow Congress to exercise independent

oversight necessary to ensure that the Department of Defense

faithfully implements the BRAC Commission's intent.

Specifically, the BRAC Commission wanted to ensure that moving

certain programs from Fort Monmouth over the six-year implementation period would not adversely affect such programs or "sacrifice or shortchange ongoing C4ISR support and services to warfighters in the field." (Id. at 11.)

The President approved the BRAC Commission's recommendations and certified his approval to Congress on September 15, 2005. (Defs. Motion to Dismiss Br., at 14.)  Congress did not pass a joint resolution disapproving or rejecting the BRAC Commission's recommendations within 45 days of the President's certification, and thus, they became final.  (Id.; see Compl., at ¶ 101.) Therefore, the Department of Defense was required to initiate the closure of Fort Monmouth by September 15, 2007, and the closure must be completed by September 15, 2011.  See BRAC Act § 2904(3)-(4).  (See Defs. Prelim. Injunc. Br., at 2.)

The Department of Defense and the Army have begun preparing for the closure of Fort Monmouth and the transfer of its organizations and functions to other facilities such as the Aberdeen Proving Ground by, inter alia, executing a contract for improvements to the Aberdeen Proving Ground.  (Defs. Prelim. Injunc. Br., at 3.)  Additionally, the Director of the Communications Electronics Research, Development, and Engineering Center ("CERDEC") circulated a memorandum to CERDEC employees (1) noting that Fort Monmouth is scheduled for closure, and thus, the Fort Monmouth CERDEC will move to Aberdeen Proving Ground in 2010

or 2011, (2) stating, "[o]ur approach is to reassign positions in order to provide our employees with an opportunity to volunteer for an opportunity to settle into the new location in an earlier timeframe while allowing them to continue their contribution to the critical missions CERDEC provides to the Army", and (3) asking for 32 employees in specific mission areas to volunteer to move to the Aberdeen Proving Ground in November 2007, and offering incentives to such volunteers. (Id., Ex. 1, 8-17-07 CERDEC Mem., at 1-2.) To date the Secretary has not submitted a report to Congress addressing how the transfer of functions and organizations such as CERDEC from Fort Monmouth to the Aberdeen Proving Ground will not disrupt the war on terrorism or other critical military operations. (Defs. Prelim. Injunc. Br., at 2 n.1; Compl., at ¶ 107.) Nevertheless, Defendants assert that the Department of Defense intends to submit such a report to Congress by the end of this year. (Defs. Prelim. Injunc. Br., at 2 n.1; see id., Ex. 2, Condon Decl., at ¶ 7.)

## CONCLUSIONS OF LAW

Defendants argue that Plaintiffs are not entitled to the extraordinary remedy of a preliminary injunction because they have (1) not shown they are likely to succeed on the merits, (2) failed to establish that they will be irreparably harmed if a preliminary injunction is not granted, (3) failed to establish that a preliminary injunction would not harm Defendants, and (4)

made a "preliminary injunction request [that] is inimical to the public interest."  (Defs. Prelim. Injunc. Br., at 1.)   In contrast, Plaintiffs contend, without providing any supporting analysis, that "they have met their legal burden" with respect to the four factors the Court must consider in deciding whether to issue a preliminary injunction.  (Pls. Prelim. Injunc. Br., at 10.)[4]  The Court finds that Plaintiffs have not satisfied the elements of a preliminary injunction, and thus, we will deny the order to show cause.  The findings and conclusions set forth in this opinion are preliminary only, based upon the state of the record at this stage in the litigation.  See Fed.R.Civ.P. 65(a). The parties have preserved all rights to present their disputes to a fact-finder if the action proceeds in this Court.

## I.   Legal Standards Governing Preliminary Injunctions

Injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances."  Frank's GMC Truck

----

[4] In their brief in opposition to Defendants' motion to dismiss, Plaintiffs describe their preliminary injunction application as seeking to "preliminarily enjoin the Secretary of Defense and Secretary of the Army from engaging in any affirmative closure action or affirmative execution of closure plans (as opposed to mere closure **planning** which is not being challenged) until the Report Requirement of paragraph 5(f) is complied with."  (Pls. Motion to Dismiss Br., at 19 (emphasis original).)  The "Report Requirement" refers to the BRAC Commissions' statement that the Secretary "shall submit a report to the Congressional Committees of Jurisdiction" regarding the movement of organizations and functions from Fort Monmouth to Aberdeen Proving Ground, which is found in paragraph 5(f) of the final version of the 2005 BRAC Order.  (Id. at 20; see Compl., at ¶ 103.)

Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988) (citations omitted).  To obtain such interim relief, a movant must demonstrate both a likelihood of success on the merits and the probability of irreparable harm absent the injunction.  Id. Thus, in determining whether to issue a preliminary injunction, the Court must consider whether (1) the movant has shown a reasonable probability of success on the merits, (2) the movant will be irreparably injured by denial of the relief, (3) granting the preliminary relief will result in even greater harm to the nonmoving party, and (4) granting the preliminary relief is in the public interest.  ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1477 n.2 (3d Cir. 1996) (citations omitted); AT&T Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994) (citations omitted); see The Nutrasweet Co. v. Vit-Mar Enter., Inc., 176 F.3d 151, 153 (3d Cir. 1999). The Court should issue an injunction "only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief."  AT&T Co., 42 F.3d at 1427 (citation omitted); see The Nutrasweet Co., 176 F.3d at 153 (noting that a plaintiffs' failure to establish any one of the four elements renders a preliminary injunction inappropriate).

## A.   Reasonable Probability of Success on the Merits

The party seeking a preliminary injunction must demonstrate a "reasonable probability of eventual success in the litigation."

Kershner v. Mazurkiewicz, 670 F.2d 440, 443 (3d Cir. 1982).  In
evaluating whether a movant has satisfied this first part of the
preliminary injunction standard, "[i]t is not necessary that the
moving party's right to a final decision after trial be wholly
without doubt; rather, the burden is on the party seeking relief
to make a prima facie case showing a reasonable probability that
it will prevail on the merits."  Oburn v. Shapp, 521 F.2d 142, 148
(3d Cir. 1975).

**B.   Irreparable Injury**

"In general, to show irreparable harm a plaintiff must
demonstrate potential harm which cannot be redressed by a legal
or an equitable remedy following a trial.  Economic loss does not
constitute irreparable harm."  Acierno v. New Castle County, 40
F.3d 645, 653 (3d Cir. 1994) (citations and quotations omitted).
"Grounds for irreparable injury include loss of control of
reputation, loss of trade, and loss of good will."  Kos Pharm.,
Inc. v. Andrx Corp., 369 F.3d 700, 726 (3d Cir. 2004).  Further,
irreparable harm must be of a peculiar nature and must be
incapable of pecuniary measurement.  See id. at 727; Clarke
Transp. Serv., Inc. v. Haskins, No. 06-785, 2006 U.S. Dist. LEXIS
38137, at *6 (E.D. Pa. June 9, 2006).

**C.   Harm to Nonmoving Party**

The Court must also analyze whether the defendant will
suffer irreparable harm if the preliminary injunction is granted.

14

Kos Pharm., Inc., 369 F.3d at 727.  If the Court finds that such
temporary relief may irreparably harm the defendant, then it must
"balance the hardships" to ensure that the injunction does not
harm the defendant more than denial of the injunction would harm
the plaintiff.  Id. (noting in trademark infringement action that
court should balance hardships to ensure that issuance of
injunction would not harm infringer more than denial would harm
original mark owner); Constr. Drilling, Inc. v. Chusid, 63
F.Supp.2d 509, 513 (D.N.J. 1999) (stating that courts must
"balance the hardships to the respective parties" in determining
whether to issue a preliminary injunction).  The "injury a
defendant might suffer if an injunction were imposed may be
discounted by the fact that the defendant brought that injury
upon itself." Kos Pharm., Inc., 369 F.3d at 728 (citation and
quotations omitted).  Further, "[i]rreparable harm must be of a
peculiar nature, so that compensation in money alone cannot atone
for it." Id. at 727.  Thus, the Court should not consider
financial damages when deciding whether to grant an injunction.
Id. at 728.

     **D.   The Public Interest**

The public interest will almost always favor the plaintiff,
if the plaintiff demonstrates both a likelihood of success on the
merits and irreparable injury.  AT&T Co., 42 F.3d at 1427 n.8.

## II.  Legal Standards Applied Here

### A.   Irreparable Harm to Plaintiffs

Defendants argue that Plaintiffs have presented no evidence suggesting that they will be irreparably harmed in the absence of an injunction.  (Defs. Prelim. Injunc. Br., at 7.)  Defendants assert that (1) making plans for the eventual closure of Fort Monmouth is appropriate and does not in any way harm Plaintiffs, (2) construction activities at the Aberdeen Proving Ground will not affect Plaintiffs, and (3) asking volunteers to make an early move to the Aberdeen Proving Ground does not constitute irreparable injury because an employee transfer can be reversed and any associated moving costs redressed.  (Id. at 7-8.)  The Court agrees with Defendants and finds that Plaintiffs have not shown that they will be irreparably harmed absent an injunction.

Plaintiffs seek, inter alia, an order:

> [I]nterpreting paragraph 5(f) of the 2005 BRAC Order and declaring that as a matter of federal statutory law that the [Department of Defense] is administering a conditional closure of Fort Monmouth, and further enjoining defendant Secretary of Defense and Secretary of the Army from taking any action whatsoever to close Fort Monmouth or move the military mission located at Fort Monmouth generally, and the C4ISR Program specifically, to Aberdeen, Maryland until such time as the Secretary of Defense complies with specific federal law, namely the Congressional "Report" requirement as outlined in the 2005 BRAC Order paragraph 5(f) . . . . (Pls. Prelim. Injunc. Br., at 2.)

> [D]eclaring that . . . any further Report on the issue of Fort Monmouth by the closure of Fort Monmouth will not be entitled to a presumption of accuracy . . . . (Id. at 2-3.)

16

[D]eclaring that the GAO Report . . . did not comply
with the mandatory independent review requirements as
required by 1990 BRAC Act sec. 2903(d)(5)(B) as amended
by 2005 BRAC Act sec. 2914(d)(6) as applied to their
statutory obligation to conduct a timely comprehensive
review of the Secretary's recommendation to close Fort
Monmouth.  (Id. at 3.)

[D]irecting defendant Comptroller General of the United
States of America to, through the office of the [GAO],
conduct the mandatory detailed independent review of
the Secretary of Defense's closure recommendation as to
Fort Monmouth . . ., and thereafter prepare and serve a
written report with the conclusions reached in such
independent review to the Secretary of Defense,
Secretary of the Army, the 2005 BRAC Commission, the
President, the Congress and this Court[.] (Id. at 3-4.)

[A]llow[ing] the now executed contract[, which was the
subject of a Request for Proposal,] to stand but for
the Court to Order defendants Secretary of the Defense
and Secretary of the Army to issue an Order Suspending,
Stopping, or Delaying any further action on the
contract at issue as per the authority granted to them
to do so in the Federal Acquisition Regulation. . . .
(Pls. Suppl. Injunc. Br., at 2.)

Defendants acknowledge that the BRAC Commission, in its

report to the President, stated that the Secretary "shall submit

a report to the Congressional Committees of Jurisdiction"

explaining that moving the organizations and activities located

at Fort Monmouth to the Aberdeen Proving Ground will not disrupt

support for the "Global War on Terrorism or other critical

contingency operations. . . ."  (Report Excerpts, at 12.)

Further, Defendants state that the Department of Defense intends

to submit such a report to Congress by the end of this year.

(Defs. Prelim. Injunc. Br., at 2 n.1; see id., Ex. 2, Condon

Decl., at ¶ 7.)  The timing of when the Department of Defense

17

submits the report does not in any way impact Plaintiffs, regardless of whether the contents of such report are accurate. Congress has already approved the closing of Fort Monmouth, and it is this approval that impacts Plaintiffs, not any supplemental report detailing how the movement of organizations and functions from Fort Monmouth will not disrupt support for military troops in combat.

The GAO report, which only references Fort Monmouth a few times and in very general terms, similarly does not impact Plaintiffs in any significant way.  (See Compl., at ¶ 66.)  The BRAC Commission performed its own review of the Secretary's base closure recommendations, and thus, did not rely on the GAO report in making its own base closure and realignment recommendations. (See id. at ¶ 69.)  Accordingly, even if the GAO report was not sufficiently thorough and detailed or otherwise in accordance with the provisions of the BRAC Act, there is no potential harm to Plaintiffs by this Court either refusing to expressly declare that the GAO report did not comply with the BRAC Act's independent review requirements, or directing the Comptroller General, through the GAO, to perform another, more detailed review of the Fort Monmouth closure recommendation.

Plaintiffs also cannot claim they will be harmed by construction activities at the Aberdeen Proving Ground in Maryland.  The Department of Defense was required to initiate the

closure of Fort Monmouth by September 15, 2007, and the closure must be completed by September 15, 2011.  See BRAC Act § 2904(3)-(4).  (See Defs. Prelim. Injunc. Br., at 2.)  Thus, it was reasonable and necessary for the Department of Defense and the Army to enter into a contract for initial improvements to the Aberdeen Proving Ground.  Plaintiffs, a union representing Fort Monmouth employees, its president, and certain of its members, do not face any harm peculiar in nature or incapable of pecuniary measurement if the Court does not grant their request and direct Defendants to stop work on the contract for improvements to the Aberdeen Proving Ground.  See Kos Pharm., Inc., 369 F.3d at 727; Haskins, 2006 U.S. Dist. LEXIS 38137, at *6.  Instead, any projects or improvements performed in Aberdeen, Maryland have no direct effect on Plaintiffs, who continue to perform their employment responsibilities at Fort Monmouth.

Plaintiffs are aware that the functions and organizations located at Fort Monmouth will eventually be transferred to Aberdeen and other areas by 2010 or 2011.  The CERDEC Director has offered incentives to employee volunteers willing to transfer from Fort Monmouth to Aberdeen in November 2007, but no employees have been required to relocate at this time.  A transfer, particularly a voluntary transfer, does not constitute irreparable harm because the transferred employee can (1) always be returned to his or her original shift or location, and (2) be

compensated for any monetary damages incurred as a result of such transfer.  See Moteles v. Univ. of Pa., 730 F.2d 913, 919 (3d Cir. 1984) ("If a discharge from employment with all of its attendant difficulties is not irreparable injury, it is obvious that the involuntary transfer to another shift amounts to nothing more than inconvenience – not enough to warrant the issuance of a preliminary injunction."); see also Morton v. Beyer, 822 F.2d 364, 366, 372-73 (3d Cir. 1987) (reversing grant of preliminary injunction, which required the defendants to return a suspended employee to active employment, because there was no support for the district court's finding of irreparable harm and the plaintiff "failed to allege facts which, if true, could not be adequately remedied by money damages").

If the decision to close Fort Monmouth is revoked, the harm to Plaintiffs would be capable of pecuniary measurement and would amount to nothing more than inconvenience.  See Moteles, 730 F.2d at 919.  Therefore, the Court finds that Plaintiffs have not demonstrated that unless the Court grants their preliminary injunction request they will be subject to harm that cannot be redressed through a legal or equitable remedy.  See Acierno, 40 F.3d at 726 (explaining that irreparable harm is harm that cannot be redressed by legal or equitable remedy following trial).

20

**B.   Harm to Defendants**

Defendants argue that they would be harmed irreparably if this Court grants Plaintiffs' preliminary injunction application. (Defs. Prelim. Injunc. Br., at 10.)  Defendants emphasize that the Department of Defense and the Army have determined that the activities at issue here, including taking initial steps toward improving the Aberdeen Proving Ground and asking CERDEC employees to volunteer for early transfer, are important to the achievement of specific military objectives.  (Id.)  Thus, Defendants assert that Plaintiffs' proposed injunction would (1) interfere with efforts to mitigate mission disruption, (2) increase the potential for losing personnel with necessary technological knowledge, and (3) make it impossible for the Army to comply with the BRAC Act's requirement that a base be closed within six years from the date the President approves the closure recommendation. (Id. at 10-11.)  Defendants contend that these potential consequences are serious and irreparable.  (Id. at 11.)

The Department of Defense must completely close Fort Monmouth by September 15, 2011.  See BRAC Act § 2904(3)-(4). (See Defs. Prelim. Injunc. Br., at 2.)  If this Court were to grant Plaintiffs' preliminary injunction request and enjoin Defendants from proceeding with its planned improvements to the Aberdeen Proving Ground, Defendants would likely be unable to meet their statutory obligation to close Fort Monmouth by this

date.  Further, Defendants note that it is necessary for them to obtain early transfer volunteers because (1) they need to start new Army Technology Objective and core Science and Technology programs at the Aberdeen Proving Ground in early 2008, in order to "minimize[] disruption and reduce[] risk that would be inherent in moving them after work on the programs has already begun", and  (2) delaying the transfer process increases the risk of losing personnel fluent in certain technologies.  (Defs. Prelim. Injunc. Br., Ex. 2, Condon Decl., at ¶¶ 2-4.)  Plaintiffs have not offered any evidence to contradict these assertions. Therefore, this Court concludes that granting Plaintiffs' preliminary injunction request would substantially harm Defendants' ability to retain much-needed personnel, mitigate disruptions, and implement new programs.

The Court also concludes, in light of our previous determination that Plaintiffs have not demonstrated that they will be irreparably harmed if this Court refuses to grant the preliminary injunction, that the balance of the hardships weighs in favor of Defendants.  See Kos Pharm., Inc., 369 F.3d at 727 (explaining that if the Court finds that a preliminary injunction may irreparably harm the defendant, it must "balance the hardships" to ensure that the injunction does not harm the defendant more than denial of the injunction would harm the plaintiff); Chusid, 63 F.Supp.2d at 513 (stating that courts must

22

"balance the hardships to the respective parties" in determining whether to issue a preliminary injunction).

### C.   Reasonable Likelihood of Success on the Merits

Defendants argue that Plaintiffs do not have a likelihood of success on the merits because, inter alia, (1) "Congress has demonstrated a clear intent to preclude judicial review of the formation and implementation of the BRAC closure recommendations", (2) they lack prudential standing, and (3) non-statutory review is not available.  (Id. at 11.)  In contrast, Plaintiffs argue that their factual and legal claims are justiciable because, inter alia, they "are merely asking the Court to use its Article III powers and interpret . . . federal law and give guidance and direction to the executive branch as to Count I and to correct procedural flaws that resulted in an improper (and essentially illegal ) recommendation as to Fort Monmouth."  (Pls. Motion to Dismiss Br., at 6.)  Further, Plaintiffs state that "they have met their legal burden" with respect to their preliminary injunction application.  (Pls. Prelim. Injunc. Br., at 10.)  The Court finds that Plaintiffs have not demonstrated a reasonable likelihood of success on the merits with respect to their claims.

Plaintiffs allege, inter alia, (1) "[t]he actions of the Secretary . . . and the Secretary of the Army in proceeding with any activity associated with a closure of Fort Monmouth before

23

providing the required 'detailed report' to Congress as required by 2005 BRAC Order paragraph 5(f) is illegal as contrary to federal law and/or is ultra vires and/or is arbitrary, capricious and unreasonable", (2) the Secretary's inclusion of Fort Monmouth in its initial closure recommendations violated federal law, (3) the BRAC Commission violated federal law by keeping Fort Monmouth on the closure list in its report and recommendations to the President and Congress, and (4) "[t]he facts in the record did not support inclusion of Fort Monmouth on the closure list of the Secretary . . . or the keeping of Fort Monmouth on the closure list by the 2005 BRAC Commission which action was in all instances arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with Federal law." (Compl.)  When a plaintiff requests judicial intervention in the internal affairs of the military, as Plaintiffs ultimately do here, such plaintiff must make a stronger showing of a likelihood of success on the merits than the ordinary standard for injunctive relief. Hartikka v. United States, 754 F.2d 1516, 1518 (9th Cir. 1985). "The necessity of making this stronger showing is implicit in the magnitude of the interests weighing against judicial interference in the internal affairs of the armed forces."  Id.

Assuming arguendo that the Court has subject matter jurisdiction over Plaintiff's claims, Plaintiffs have not made a sufficiently strong showing that they are likely to succeed on

the merits of such claims.[5]  First, Plaintiffs have not
identified any authority suggesting that the Department of
Defense must satisfy the BRAC Commission's report requirement
before it takes any steps to prepare for the eventual transfer of
certain Fort Monmouth organizations and functions to the Aberdeen
Proving Ground.  Instead, the BRAC Commission's directive
contains no explicit time restriction, but simply states that the
Secretary "shall submit" a report describing (1) how the
transfers will not disrupt support for troops fighting the war on
terrorism or other critical military operations, and (2)
safeguards the Department of Defense has put in place to mitigate
degradation of support to troops in the field and to ensure
maximum workforce retention.  (See Report Excerpts, at 12.)
Moreover, the Defendants have assured this Court that the
Department of Defense intends to comply with this report
directive by the end of this year.  (Defs. Prelim. Injunc. Br.,
at 12 (stating that the Department of Defense "is planning to
submit a report to Congress as soon as practicable and before the
vast majority of movement of functions").)

     Plaintiffs also have not made a strong showing that either
the Secretary or the BRAC Commission violated any law in
recommending the closure of Fort Monmouth.  In contrast, the

---

     [5] The Court will not address Defendants' motion to dismiss
for lack of jurisdiction at this time.

Secretary followed the specific requirements set forth in the
BRAC Act in making his recommendations regarding Fort Monmouth,
including (1) creating a "force-structure plan" and
"comprehensive inventory of military installations" (see BRAC Act
§ 2912(a)(1)(A)), (2) issuing the Transformation Through Base
Realignment and Closure memorandum (see BRAC Act §§
2912(a)(1)(A), 2912(a)(2) (requiring Secretary to prepare a
"force-structure plan" and report on the infrastructure necessary
to implement such plan)), (3) certifying that the need exists to
close certain military bases such as Fort Monmouth after
reviewing numerous assessments and facility value analyses
performed separately by the Army, Navy, and Air Force (see BRAC
Act § 2912(b)(1)), and (4) specifically recommending that certain
bases be closed or realigned (see BRAC Act § 2914(a)).  (See
Report Excerpts, at 319-320, 10.)

    The Secretary explained that "[t]he closure of Fort Monmouth
and relocation of functions that enhance the Army's military
value, is consistent with the Army's Force Structure Plan, and
maintains surge capabilities."  (Id. at 11.)  Similarly, the BRAC
Commission also followed the specific requirements set forth in
the BRAC Act in making its recommendations regarding Fort
Monmouth, including (1) reviewing and analyzing the Secretary's
base closure and realignment recommendations by, inter alia,
forwarding specific questions regarding the functions performed

26

at Fort Monmouth to the Department of Defense, (2) visiting 182
military bases, holding 20 legislative and deliberative hearings,
hosting 20 regional hearings, and reviewing over 200,000 written
and electronic communications from the public (see BRAC Act §
2903(d) (stating that the BRAC Commission must hold public
hearings on the Secretary's recommendations)), (3) presenting its
final report on the Secretary's recommendations to the President
on September 8, 2005 (see BRAC Act § 2914(d)(1)), and (4)
adopting the Secretary's recommendation with respect to Fort
Monmouth, but directing the Secretary to submit a report
explaining, inter alia, how moving organizations and activities
located at Fort Monmouth to the Aberdeen Proving Ground would not
disrupt the war on terrorism or other critical military
operations.  (Compl., at ¶¶ 69-72, 77, 79; Defs. Motion to
Dismiss Br., Ex. A, 9-8-05 BRAC Commission Letter to President,
at 1; Report Excerpts, at 12.)  Therefore, the Court finds that
Plaintiffs have not demonstrated a likelihood of success on the
merits here.

    **D.  Public Interest**

    Defendants argue that Plaintiffs' proposed preliminary
injunction could harm the public by potentially disrupting the
Department of Defense's national security operations.  (Defs.
Prelim. Injunc. Br., at 14.)  Defendants further argue that
Plaintiffs' preliminary injunction request "threatens the public

interest" because it seeks "to enlist the Court to supervise the transfer of programs from Fort Monmouth and second-guess [the Department of Defense's] judgment on how to undertake the 'complicated process of closing' Fort Monmouth". (Id.) Plaintiffs, in contrast, state that "they have met their legal burden" with respect to their preliminary injunction application. (Pls. Prelim. Injunc. Br., at 10.) At oral argument, Plaintiffs asserted that granting their preliminary injunction request would benefit the public by ensuring that taxpayer money is not unnecessarily expended on improvements to the Aberdeen Proving Ground. (See dkt. entry no. 15.)

The Court concludes that granting Plaintiffs' request for preliminary relief would not further any public interest. Instead, the relief Plaintiffs seek would be detrimental to the public because it would require this Court to (1) interfere with the Department of Defense's strategic decisions, (2) disrupt national security operations, and (3) use its resources to essentially monitor and scrutinize each step taken by the Department of Defense toward closing Fort Monmouth. Further, the public interest factor weighs in favor of Defendants because Plaintiffs have not demonstrated either a likelihood of success on the merits or irreparable injury. See AT&T Co., 42 F.3d at 1427 n.8. Thus, the public interest does not favor injunctive relief here.

28

**CONCLUSION**

The Court, for the reasons stated <u>supra</u>, will (1) deny Plaintiffs' application for a preliminary injunction, and (2) deny Defendants' motion without prejudice.  The Court will issue an appropriate order.


                                                     _____s/ Mary L. Cooper_____
                                                     **MARY L. COOPER**
                                                    United States District Judge

Dated:  November 15, 2007